Is that correct? You're an appellate, right? That's correct. I'm, I'm back. Your seat is okay? Okay. Please proceed. Good morning, your honors. I was having some trouble unmuting my audio. Good morning, your honors. May it please the court. My name is Catherine Halpert and I represent the Motion Picture Industry Health Plan and the Board of Directors of the Motion Picture Industry Health Plan. I would like to reserve three minutes for rebuttal. Keep your eye on the clock. We'll try to help you. Thank you. The court's order on plaintiff's motion for order for reconsideration and the judgment in favor of the appeal appellee should be reversed. The district court erred when it reversed its own grant of summary judgment in favor of the plan and awarded plan benefits to the Mulls not provided for under the terms of the plan and found that the plan's self-executing contractual recoupment provisions violate ERISA's civil enforcement scheme. The court's order disregards the plan's written contractual provisions for the receipt of benefits and correction of plan overpayments, ignores the which is to protect the contractually defined benefits set forth in the written plan document. The court further erred in holding that the plan's enforcement of its own contractual terms constitutes a claim which can be barred by race judicata, rules regarding compulsory counterclaims, and is subject to contractual affirmative defenses. In 2017, this court determined that the MPI health plan active summary, excuse me, active health plan summary plan description, which I'll simply refer to as the SPB or the plan, is a fully enforceable plan document contemplated by ERISA section 402B. The district court had previously dismissed with prejudice the Mulls' claim that the SPD recoupment provisions were rendered unenforceable because they violated plans disclosure obligations under Title I. This clarity claim was not reasserted by the Mulls in the First Amendment complaint. Therefore, the plan document is fully enforceable and it's unambiguous. Can I ask you, counsel, are there any limits on how unreasonable a plan's reimbursement provisions can be? Is there anything? Because I'm thinking of hypotheticals that are even worse than this. And I'm just wondering, is there some line that you can assure us that, well, this is barely okay? And I think that's the best you could hope for is that this is barely okay because it's incredibly unfair, it seems to me. But is there any limit or could you just say that, well, if any person in our plan with the last name of Mull defaults on their reimbursement obligation, every other person with that same last name, even if they're not related, they can be held responsible as well. You see what I'm saying? Is there some outer limit that you can assure us that exists here? Well, Your Honor, I think that the actual provisions of the plan dictate the equities as found in McCutcheon. Nevertheless, in responding to your question, I would assume that at some point, if it did not seek a reimbursement according to the contractual terms between the plan and the participant, there may be some other provision of ERISA that would be violated. I'm asking you, let's say that the plan, not that you would be this unreasonable, your client wouldn't be this unreasonable, but let's say that the plan had some pretty onerous reimbursement provision in it. Nobody ever reads these things until a problem arises and you look and say, oh my God, wait a minute, I'm actually on the hook for all the moles all over the country who just happen to share my same last name and by golly, this plan says that I am responsible for their failure to reimburse the plan. Nobody would say that that was at all reasonable, right? That's correct. I'm saying if the plan for some reason had that provision in it, is there some judicially enforceable remedy that somebody could seek to say, well no, surely you're not going to deprive me of health benefits for the rest of my life just because somebody I don't even know defaulted on their reimbursement obligation. I don't think that the structure of ERISA would allow that simply because the plan is the contract between the plan and the participant and the participant agrees, especially under the terms of this plan, to accept benefits based upon certain conditions. In this case, the participant did accept those benefits and his dependents accepted those benefits and I think that the courts have determined that, as in McCutcheon, that the equitable defenses to that provision are, you know, there are no equitable defenses to that particular provision. If it were trying to enforce obligations that go beyond the relationship between the participant and the plan, I think there may be some issues. But we don't have that situation here, your honor. We have a situation where we have very far, you know, a plan clearly and consistent with the goals of ERISA to preserve plan assets for the benefit of all participants, the plan provides for a method to recoup plan overpayments. And in this case... What if, I guess, you didn't really answer my previous question so let me just press it on our facts. Let's say that Mr. Moll had no control over his daughter's actions, that he begged her with all his might to honor the reimbursement obligation and he never touched a penny of his money. His daughter is the only one who got it. She was an adult. He had no ability to stop her from just running off with the money and spending it on a lavish vacation in Italy. And so, but he, his wife and his other dependents, you know, perhaps for the rest of their life will never be able to secure any health benefits under the plan. That strikes me as... I'm kind of shocked that your client is even pressing this position, it strikes me as incredibly unreasonable. And so, what I'm trying to get at is that there's no limit on how you could come up with the most outrageous facts and as long as the plan term said, well, hey, we're entitled to do this, that's just the end of it? Well, first of all, your honor, it is a unique situation in this case, but you can't invalidate the whole plan based on a unique situation. Mr. Moll and his daughter have, the benefits that were provided to Lene Moll were provided solely through his participation in the plan. Therefore, obviously, it would be any plan that went beyond that relationship would be problematic. To this case, they're not without remedy and, you know, that's between Mr. Moll and his daughter. But looking forward, it's not that they, but for this, the plan would have no way to enforce its overpayment provisions. In other words, you could always say, well, any of my dependents did not provide, did not pay it back, so I'm not responsible, which is really not what ERISA requires, you know, basically what the plan provides or what's allowed under ERISA. This is a particular relationship between the plan and a participant and the plan is very specific when it says that if an overpayment results, which in this case it did because of her refusal to reimburse the plan, then the remedies are very specific in the plan. And in this case, we're not seeking to enforce her obligation to reimburse. We're seeking an enforcement of an obligation to recoup overpayments that arose because she accepted benefits through Mr. Moll for, as the plan is very specific, that they don't cover services rendered with regard to third-party liability, but they'll only do it under specific contractual conditions. Mr. Norman Moll and Lynnae signed the lien saying that they would reimburse. She didn't do it. She got the proceeds as an adult. She didn't reimburse, but the reality is, is that once that occurs, it's a plan overpayment. And under the specific terms of the plan, the plan has remedies which are not violative of ERISA, which says that number one, they can either, that it's the obligation of the participant to refund those overpayments that arise because of the provision of the benefits given to him and to his... Yeah, and I'm not disputing that the plan's terms do allow your client to do what it's doing. That's not, and obviously that's not the question before us, but let me ask you this. You said that the self-help provisions in the plan don't violate ERISA, but why isn't the better interpretation of ERISA to say that, listen, you as the plan, if you could not, through a judicial action, obtain the remedy you're seeking, we're not, you know, basically the self-help remedies have to be co-extensive with whatever judicial remedies you would be able to obtain. Why isn't that the better reading of ERISA? I'm sorry. Your Honor, I don't understand that question. Could you repeat that? Sure. You would, let me break it up. If you tried to go into court and sue Mr. Mull for the relief that you're seeking, you would not be able to obtain that. Do you agree with that? That's correct, Your Honor, because that's not the equitable relief provided under the... Exactly. Okay. So my question was simply, why should the self-help remedies that the plan arrogates to itself have to be limited by whatever it could obtain in court? Why shouldn't those two things be co-extensive with one another? Because they arise from two different obligations. As you know, the long line of cases that determine what the scope of remedial relief is under 502 are limited by the statute itself. We're not seeking a civil action. We have an enforceable right to administer our own plan in accordance with its terms. I think that the distinction between the limitations on relief under 502 and the right to administer its own plan was discussed in the Northcutt case, which is cited in our brief. This is not judicial relief. The limitations under 502 apply only to civil actions. In Northcutt, it was specifically the same situation, and they indicated that it was not an attempt to circumvent the strictures of 502, rather it's the plan in accordance with the goals of ERISA to preserve the integrity of the written plan document and the benefits for all participants. They said this is not judicial relief. Can I just get a little clarification? The personnel acknowledged that distinction between the rights to exercise self-recoupment and the rights under 502A3. Let me get a little clarification here, please. I think I heard you say that after the money was paid to the daughter, that she and Mr. Moll signed some kind of a lien. Is that correct? No. It was before. The plan provides that they don't provide benefits for non-covered services for third party. Right. Prior to providing those benefits, both Mr. Moll and his daughter signed a lien saying that they would repair the... So we have something different here that you didn't discuss with my colleague. It isn't just the plan. In the actual fact, in terms of dealing with the Molls here, they were specifically told that if she's going to get money here, you need to sign a lien that says you're going to pay it back. Right? That's correct. Okay. And then you later on filed a counterclaim, which to me is more like an in rem action rather than in persona action. Would you agree with that? That's correct, your honor. So basically what you're saying is she signed a lien, he signed a lien. You had an in rem action. There's nothing to collect. She went into bankruptcy. So at that point, any other remedy that you would have gotten through the lien or the plan basically is exhausted. So at that point, you then turn to the plan itself, which says this is your self-help remedy. Is that correct? That's correct, your honor. Under the terms of the plan, there are two distinct remedies, and neither is dependent... The unavailability of one does not foreclose the use of the other. One is a contractual remedy, which is not limited by 502A3, and the other is the civil action, which of course is limited. To me, the lien is a significant factor in this because, as my colleague points out, I mean, almost nobody reads them. Even the lawyers have trouble reading and understanding them. But in this case, they were told specifically, if you want this money, you've both got to sign this lien. You've got to pay it back. That's correct. So a specific contractual obligation there didn't just come out of the blue, and that, I would argue, probably helps this case to be a little distinct from the parade of horrors that my colleague has aptly painted. Is that a fair statement? That's correct, your honor. Okay. Do you want to save any of your time for rebuttal? There's not much left, but you don't have to. Well, your honor, I do want to just point to the Montanel case, which also addressed the specific distinction between the plan administering its own benefits and enforcing ongoing performance obligations, like the plan and the mulls have here, versus the strictures or the limitations imposed by the court under a claim for in-rem relief under 502A3. Thank you. Okay. Thank you. Do either of my colleagues have additional questions for Ms. Halford before we move on to Mr. DiCamera? Okay. Hearing none, then, Mr. DiCamera, please proceed. Good morning, your honors. Don DiCamera, appearing for the mall plaintiffs. This action was filed in 2012 to restore the mull family's health coverage that was earned by Norman Mull's several decades' work for the ocean picture industry as a wrangler. In 2010, all four mull family members were covered by this health plan. Lene Mull was hurt in a very serious accident in 2010 while she was an adult. She later recovered the sole policy limit that was available in 2011 at age 20. MPI's lawsuit against Lene Mull and all of their claims were discharged by the federal bankruptcy court in 2014, and she's been out of this case since 2015. The three mulls remaining in the case did not recover anything from Lene's case. We have no way to pay MPI back $100,000 in 2011 for over $200,000 now to restore that coverage. Counsel, let me jump right in here because you heard my discussion with Ms. Halford. Do you concede that Mr. Mull and his daughter signed what we're euphemistically calling a lien or a document that said if she gets this benefit, they've got to pay the money back? Do you agree with that? I agree they signed a reimbursement agreement. Can you enlighten us? What did that reimbursement agreement say in general terms? It provides that they will pay the money back. Aside from the plan, when the money went, Mr. Mull and the daughter, admittedly she was 20 years old, but she knew, he knew that if she was going to get the money, it had to be paid back, right? That's correct, your honor, but of course that document was not sent until after the accident and after she had incurred $190,000. I understand that, but it was before any money was paid by the plan, right? They refused to pay any money until that was signed. So they said, look, here are the terms of our plan. We're willing to pay you this money, but you've got to pay back whatever you recover. I mean, I'm sure you as a good lawyer know that almost every insurance company requires basically equitable subrogation to recover what it puts out to the degree it can. So this is a pretty normal kind of thing, admittedly, in an ERISA context. But this is, it cannot come as a shock to Mr. Mull or to his daughter that the plan expected them to honor the agreement, the reimbursement agreement, right? Right, but it did come as a shock that this provision, this recoupment provision was even in their health plan. Nobody, as both you and Judge Watford mentioned, knows that these things are in there. It's always a complete shock to the plan member or the insured. And of course... Well, let me add on that, do you quarrel with the interpretation of the plan generally? I mean, as I read your argument, it doesn't contest the interpretation of what the words say. It may be a surprise because as we all agree, nobody reads these things. But do you dispute the interpretation that's been offered of what the plan document actually says? No, we do not dispute what the plan document actually says, but we do indicate that it seems to violate ERISA's inclusive civil enforcement. It also violates the four Supreme Court cases in my point, prescribing very strict, equitable requirements for a plan to collect reimbursement against the plan member. All of these Supreme Court cases are based on trust and equity law, and there's simply no breach of contract, miscalculation indicated in ERISA. I'm having some trouble hearing you. Can you turn your volume or get closer or something? I'm sorry, it's just I want to hear what you have to say. Sure. We don't dispute what's in the document itself, but we dispute that it is enforceable because the Supreme Court has repeatedly held. Oh, they're not trying to enforce it here, though. They didn't bring this lawsuit. You did. So I'm not sure how the civil enforcement provisions speak here. Well, they've also brought the counterclaim against Norman Moll and Danielle Moll, even though they knew that Danielle Moll was the only one with funds. So this has been fully litigated. Well, but I read your brief and it even acknowledges at the time of that, and I think that was a different issue. But at the time, they didn't have the claim that you're trying to assert that they can't bring today. So how is it fully litigated? Well, it's fully litigated because they filed the counterclaim, they lost on the claim for non-dischargeability in the bankruptcy court. They lost on that. They wound up with withdrawal, all of their claims against Norman and Lene Moll in the two different courts after failing to state a cause of action against them. And so that wound up in two final judgments in favor of the only two Molls. Now, if they've got contractual claims, then those contractual claims are subject to our impossibility of performance and unconscionability. And they acknowledge that those are valid contractual defenses, and yet they the court relied on illegality and impossibility of performance. The Molls didn't have a hundred thousand then. They don't have two hundred and ten thousand now. So it's a physical impossibility for them to pay back. It's a legal impossibility because Montanil says they've got to go after only the Molls. So you've got an in rem action. Would you agree that ultimately with the counterclaim, what you have is an in rem action at this point? Yes. OK, so you're going after funds. OK, so nobody's disputing that. So you're not going after individual people. But when you look at the plan, the plan says basically, you know, if all else fails, this is what we can do. And Mr. Moll signed a document indicating would be reimbursed. I don't know whether there was any reference in that to the plan. Perhaps there was. Perhaps there wasn't. But is it your position that there is something in ERISA itself that says that they cannot use this self-help in this situation? And if so, what is the section or section? Yes. 1132 A3 and the interpretation by the Supreme Court of the ERISA exclusive civil enforcement rule. Since Congress. So tell me why the civil enforcement rule applies here where they're not trying to enforce anything. Because if Congress said you can't file a civil action to do these things for breach of contract, doesn't it make sense that the Congress also intended that certainly you can't go outside a civil action and do anything you want if you allow that you're going to have most of these are. And you're going to have a plan seizing paychecks, bank accounts, houses, cars, other assets. It's as there's none of that here. I mean, if they were trying to seize things, if they were taking affirmative action, you've got great arguments. But they're not what they're doing. And I don't profess to say it sounds real attractive or reasonable or fair. But what they're doing is saying, well, this plan says they were supposed to pay us back. So we're not going to honor the part of the plan that the bulls are trying to enforce, which is pay us our benefits. Well, I'm not see that that's what they're doing. They're not bringing civil enforcement action. So I'm not sure I understand why the sections of ERISA you cite tell them they can't enforce the part of the plan that they want to enforce. But they are they are causing a complete forfeiture of the family's plan benefits. And these are at least till the time where the benefits have been refunded to the plan pursuant to the plan terms and pursuant to the agreement that Mr. Mullen, his daughter, signed, which, of course, will never happen. And well, never say never. I mean, I don't know how much it is that's left. But $210,000. So absent absent some court remedy, the the family forfeits their insurance coverage under this health plan because the adult daughter decides that she's not willing to surrender all of her $100,000 policy limits. The plan is unreasonable and equitable. So Mr. Mullen signed the agreement as well. He did, your honor. But I think any good insurance lawyer would say when you send a document to an insured or a plan member saying if you don't sign this document, we will not pay your daughter's $190,000 plus in medical expenses. Well, they didn't pay the $190,000 plus they paid, I guess, limited to $100,000. And that's part of what makes this even more unfair from my perspective. But it's what the plan says and what was signed. Yes, your honor. The plan has a distinct problem here because they violated standard rules of civil procedure regarding the Wall Street County plan. Well, let me go back to the reference in your complaint and Judge Smith, I think, suggested it. Your complaint makes clear that for the claim that they brought at that time, which we've described as an interim claim, the action had to seek not to impose personal liability on the defendant, but to restore particular funds or property in your client's possession. And they couldn't do that because they didn't have any fund that they could go for. How could losing or failing to succeed at that counterclaim bar them from taking the action they've taken since? They didn't have a counterclaim they could bring because they did have a contractual claim. They are asserting today a contractual claim. They can't sit there under the rules of compulsory counterclaims and have a contract. Your brief tells us, I just read to you, that the only thing that they could bring in the counterclaim at that time was this interim claim, which only extends to particular funds and there were no particular funds there other than the 100,000 that had been paid and we want to be able to fight against future benefits that might be paid because that wouldn't qualify as a counterclaim. I don't think the interim aspect was clear until the Montanil decision by the Supreme Court in 2016. This was long before that. So I want to get back to what Judge Clifton and I are both asking you, and you seem to be suggesting that by exercising its rights under the plan to basically not pay the additional monies until they're paid back, that that is an action, some kind of a legal action. Is that your position? It is an action. It's a it's a self-help contractual remedy. And is that action controlled by the either the federal or the state rules of procedure and that sort of thing? Yes, it is, Your Honor, because they had at the time they filed their counterclaim, they had this contractual self-help claim that they were asserting at all times. They had cut off the moles covered health benefits. And at what point at what point at what point in the litigation did they cut off the moles right to get further insurance money? And it was well before the litigation. It was in 2011 when the name declined to give them her entire one hundred thousand dollar recovery. If a plan declines to pay benefits for any reason, maybe you've gone to a carrier that's not included within the plan. Maybe it's a claim for something the plan isn't obligated to pay. Maybe it's another third party action, whatever is the plan required to go to court. To seek equitable relief or to get a declaration that they're allowed not to pay benefits. I don't think they're required to go to court, Your Honor, but if they do go to court and file a counterclaim, they better include all of these self-help contractual claims that they're asserting that rise out of exactly the same nucleus of operative facts. But what happens if the law doesn't, in this case, ERISA doesn't authorize claims at that point in time for anything else other than what we've been describing as the in-run claims? Are they stripped of any other rights just because they couldn't bring them in that context? I think they I think if ERISA does not authorize a claim, then it is prohibited by ERISA and it is unlawful. And I think that's been the well, see, now we're back to the same thing. If it's not affirmatively authorized, where does ERISA affirmatively authorize denial of benefits because a carrier is not required to cover some provider outside the system? Does ERISA ever talk about that? No. By your theory, the plan could never deny that because ERISA doesn't authorize the denial of benefits and that can't possibly be the case. So so how do we deal with this? Well, that would be inequitable and this is inequitable the way this has worked out. So I think you have to take Congress at its word that the Supreme Court has taken away our I mean, our our court's case law for a long time may have supported the result you seek, but the Supreme Court has said otherwise. And if you have a way around that, I'd be happy to hear it. I like the way that our court used to do it. But I think that race judicata applies. Merger and bar applies. They had a contractual claim they were asserting. They did not raise it when they filed their counterclaim. And after a final judgment, it's barred. OK, any of either of my colleagues have additional questions for Mr. DiCamera? I think not. So we think we thank counsel for your arguments in this case. Very helpful. The case of mall versus motion picture industry health plan is submitted and we wish you both a good day. Thank you, Your Honor. Thank you, Your Honor.
judges: CLIFTON, SMITH, WATFORD